1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| ANTONIO CAMPOS, et al., | ) | 1:12-cv-00598 LJO GSA |
| Plaintiffs, | ) ) | **FINDINGS AND RECOMMENDATIONS** |
| v. | ) ) ) | **REGARDING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND FOR STAY OF THE PROCEEDINGS** |
| CAMPOS FAMILY FARMS, LLC, et al., | ) ) | |
| Defendants. | ) ) | (Document 13) |
| _____ | ) | |

16
17

## INTRODUCTION

18

### *Relevant Procedural Background*

19      On April 16, 2012, Plaintiffs Antonio Campos and Juliet Campos, Trustees of the

20 Antonio and Juliet Campos Family Trust, doing business as Campos Brothers Farms

21 ("Plaintiffs"), filed a complaint for damages and injunctive relief against Defendants Campos

22 Family Farms, LLC, a California limited liability company, Veronica Campos, individually,

23 Fermin M. Campos, individually and as Trustee of the Fermin and Veronica Campos Family

24 Trust and the Fermin M. Campos Administrative Trust, and Alfred Martinez, individually

25 ("Defendants").  More specifically, Plaintiffs assert claims of trade name and trademark

26 infringement, unfair competition, false designation of origin, dilution of mark, damage to

27
28                                                    1

1    business reputation, use of counterfeit mark, cyberpiracy, false advertising, intentional and

2    negligent interference with prospective business advantage, fraud, breach of fiduciary duty and

3    unjust enrichment. (*See* Doc. 1.)

4        In response, on May 4, 2012, Defendants filed a Notice of Motion to Compel Arbitration

5    and for Stay of Proceedings Pending Completion of Arbitration. (Doc. 13.)

6        On May 25, 2012, Plaintiffs filed an opposition to the motion. (Doc. 17.)

7        Thereafter, on June 1, 2012, Defendants filed a reply to the opposition. (Doc. 29.)

8        This Court determined the matter was suitable for decision without oral argument

9    pursuant to Local Rule 230(g).[1]  The hearing scheduled for June 8, 2012, was vacated and the

10    matter was deemed submitted for written findings. (Doc. 30.)

11     ***Factual Summary***[2]

12        Campos Brothers Farms, a California general partnership, was originally
formed in 1957 by brothers Antonio ("Tony") Campos, and Fermin Campos, Sr.,
13    now deceased ("Fermin Sr."). Each brother owned 50% of Campos Brothers
Farms. Eventually, each brother's Family Trust became 50% owner/partner.
14    Beginning in 1957 and continuing for several years thereafter, Campos Brothers
Farms bought and leased hundreds of acres of land to farm almonds and other
15    crops.
       On June 1, 1979, Tony and Fermin Sr.'s respective corporations, Antonio
16    Campos Farms, Inc. and Fermin Campos Farms, Inc., formed F&T Farms
partnership, a California general partnership. Each brother's corporation owned
17    50% of F&T Farms. F&T Farms took over farming of the real property owned and
leased by Campos Brothers Farms.
18        In or about the early-1980s, Tony and Fermin Sr. began to expand their
business into almond hulling and shelling. By about 1981, in addition to its
19    farming activities, F&T Farms became the owner and operator of Tony and
Fermin Sr.'s first almond huller.
20        In or about the mid- to late-1980s, Tony sought to expand the business
even further by getting into the processing, marketing, and sale of almonds. He
21    registered Campos Brothers Farms with the Almond Board of California as an
almond handler to buy and sell almonds for F&T Farms, third-parties, and itself.
22    As the business continued to grow, F&T Farms built a second almond huller,
along with a 22,500 square foot warehouse and an additional packing line. By the

23

24

25    [1]The Court carefully reviewed and considered all of the pleadings, including arguments, points and
authorities, declarations, and exhibits.  Any lack of reference to an argument or pleading is not to be construed that
this Court did not consider the argument or pleading.

26

27    [2]The factual summary is taken from the complaint to provide context and only for purposes of this motion.
References to exhibits have been omitted.

28                     2

late 1980s, Campos Brothers Farms owned and leased approximately 900 acres of land.

In or about the late 1980s, Tony and Fermin Sr.'s children became more involved in the farming operations. Tony's children, Steven Campos ("Steven"), Joseph Campos ("Joseph"), and Jeannine Grech ("Jeannine"), along with Fermin Sr.'s son, Defendant Fermin M. Campos ("Fermin"), formed Campos Land, a California general partnership. Each of the four children held a 25% interest in Campos Land.

In the 1990s, Campos Brothers Farms, Campos Land, and their related entities grew the farming operation to approximately 10,000 acres. During that period of time, the handling side of the business, operated by Campos Brothers Farms, continued to grow. F&T Farms added an additional 50,000 square foot warehouse, as well as a dehydrator.

In or about the early 2000s, Tony and Fermin Sr. built and developed a manufacturing facility under F&T Farms. The facility provided F&T Farms with the capability to slice, dice, powder, flour, blanch, dry roast, and sliver their almonds. The new capabilities allowed for Campos Brothers Farms to broaden the number of almond products that it could offer its customers in the open market. The advances and growth led to the addition of a third huller, as well as an additional 100,000 square foot warehouse. By the late 2000s, F&T Farms also owned and operated a brown skin packing facility, additional packing lines, and a pasteurizer. By that time, Campos Brothers Farms, Campos Land, and their related entities owned and leased over 18,000 acres of almonds.

From about the early 1980s to the late 2000s, Tony and Fermin Sr. developed a fully integrated operation that took almonds from inception to end user. Campos Brothers Farms, Campos Land, and their related entities owned and leased the land. F&T Farms and Campos Land farmed the ground, harvested the almonds, and delivered them to the F&T Farms processing and manufacturing facilities. There, the almonds were, and continue to be, hulled, shelled, processed, warehoused, packed, and, ultimately, shipped to customers throughout the world. All of Campos Brothers Farms' (and related entities') almonds were processed under contract at F&T Farms' plant in Caruthers, California, through which Campos Brothers Farms offered and continues to offer various custom manufacturing options to customers needing superior quality and consistency in their almond products.

F&T Farms' almond processing facility utilizes cutting-edge manufacturing techniques designed to maximize sorting effectiveness and product consistency and quality. For example, F&T Farms' cutting and dicing lines are designed to optimize the effectiveness of various sorting techniques to satisfy the most rigorous customer specifications. Electronic controls monitor the temperature, moisture, pliability, and color of the product during the cutting/dicing process. In addition, F&T Farms' roasting process involves longer roasting times at lower temperatures than industry standards to maximize natural quality and consistency.

As a result of the cutting-edge processing and manufacturing facilities operated by and through F&T Farms, Campos Brothers Farms has become world renowned for its utilization of the most scientific and technologically advanced manufacturing techniques in its almond processing business, and for its continuous improvement of hulling and shelling operations, earning a name for itself as one of the world's finest natural almond processors. It is also one of the largest growers and shippers of California almonds in the State, both domestically and internationally.

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Over the course of its more than 30 years in the almond growing and processing business, Campos Brothers Farms has continuously used the name "Campos Brothers Farms" in connection with its growing, processing, marketing, and selling of its natural and processed products to identify its exceptional products, both domestically and internationally. Over the years, Campos Brothers Farms invested and expended a considerable amount of financial resources in establishing the "Campos Brothers Farms" trade name and related trademarks in the minds of customers. During this period, the "Campos Brothers Farms" trade name, trademarks, and reputation grew continuously in the hearts and minds of its customers and the public, such that they have now attained a level of recognition as a source of high quality and consistency in its almonds and almond products that is virtually unmatched by Campos Brothers Farms' competitors. Customers today associate "Campos Brothers Farms" with one of the largest and most reputable almond processors in the world, with superior almonds and almond products.

Indeed, it is precisely because of Campos Brothers Farms' stellar reputation for quality and consistency that Campos Brothers Farms has been able to attract and keep long-term international customers in countries such as Japan, which requires adherence to the most stringent quality and consistency standards and specifications. It is also because of Campos Brothers Farms' stellar reputation for meeting and exceeding the standards for brown skin and in-shell almonds in China, India, and the Middle East, that Campos Brothers Farms enjoys its premiums, a consistently high demand, and significant growth in those markets.

Campos Brothers Farms is also the only major handler in the United States which markets and sells almonds of the Marcona variety. These highly coveted almonds are of superior quality and are sold almost exclusively to customers in Spain, at a significant premium. Campos Brothers Farms controls approximately 500 acres of Marcona almonds.

Over the years, Campos Brothers Farms, by and through its relationship with F&T Farms, has continued to integrate and expand its manufacturing and processing capabilities, utilizing the most scientific and technologically advanced manufacturing techniques in its almond processing business, and has continued to improve its hulling and shelling operations. As a result of these efforts, Campos Brothers Farms' processing and manufacturing operations have enjoyed the benefit of the ever-increasing goodwill associated with the "Campos Brothers Farms" trade name, trademark and reputation.

Campos Brothers Farms' products have proudly borne the name "Campos Brothers Farms" continuously in substantially the same form and style as its now registered trademarks. These products, sold throughout the United States and the world, are identified by the "Campos Brothers Farms" name and trademarks. The names and trademarks appear on packaging and marketing materials of all sorts. []

"Campos Brothers Farms" has been registered on the Principal Register of the United States Patent and Trademark Office, U.S. Registration No. 3579184, since February 24, 2009, and remains in full force and effect. []

Campos Brothers Farms (Drawing) has also been registered on the Principal Register of the United States Patent and Trademark Office, U.S. Registration No. 3579185, since February 24, 2009, and remains in full force and effect. []

On or about October 3, 2008, Fermin Sr. passed away. Following Fermin Sr.'s death, 50% of Campos Brothers Farms was owned by Antonio Campos and Juliet Campos, as Trustees of the Antonio and Juliet Campos Family Trust, 25% was owned by Fermin M. Campos, as Trustee of the Fermin and Veronica

4

Campos Family Trust, and 25% was owned by Fermin M. Campos, as Trustee for the Fermin M. Campos Administrative Trust.

Following Fermin Sr.'s death, 50% of F&T Farms continued to be owned by Antonio Campos Farms, Inc. and the other 50% by Fermin Campos Farms, Inc.

Prior to his death, Fermin Sr. communicated his intention to Tony to initiate the dissolution of Campos Brothers Farms and F&T Farms. The parties spent considerable time negotiating dissolution of the partnerships and distribution of the assets, to no avail. On or about March 1, 2010, after several failed attempts to reach resolution, Tony sent notices of election to dissolve the Campos Brothers Farms and F&T Farms partnerships.

On or about April 12, 2010, the parties engaged in a legal action over the dissolution and winding up of Campos Brothers Farms and F&T Farms. On or about May 13, 2010, the case was submitted to binding contractual arbitration before the Honorable Justice Nicholas Dibiaso. During the course of arbitration, the parties participated in a mediation process which was spanned approximately eight months, beginning on or about August 22, 2011. The mediation sessions, conducted in person and by telephone, resulted in three controlling agreements:

a. Settlement Agreement, dated August 26, 2011 (the "Monterey Agreement");

b. Addendum to the Settlement Agreement, dated January 17, 2012 (the "Addendum"); and

c. Buy Out Agreement, dated January 17, 2012 (the "Buy Out Agreement").

In the Monterey Agreement, dated August 26, 2011, Plaintiffs Antonio Campos and Juliet Campos (and/or their assigns) agreed to purchase from Defendant Fermin M. Campos, as Trustee of the Fermin and Veronica Campos Family Trust, and as Trustee for the Fermin M. Campos Administrative Trust, the Trusts' respective interests in and to Campos Brothers Farms' handling enterprise. The purchase price for Campos Brothers Farms' handling enterprise included millions of dollars in "Cash for Goodwill (and all other matters)" of Campos Brothers Farms, including the trade name and trademarks associated with, and owned and registered by Campos Brothers Farms. The parties further agreed to work together to equitably sever their mutual interests in the balance of the assets of Campos Brothers Farms, according to each partner's pro rata share.

In the Monterey Agreement, dated August 26, 2011, Plaintiffs Antonio Campos and Juliet Campos (and/or their assigns) further agreed to purchase from Fermin Campos Farms, Inc., its interest in the enterprise and related processing and manufacturing assets of F&T Farms. The purchase price was millions of dollars in cash, plus millions of dollars in real property. The parties further agreed to work together to equitably sever their mutual interests in the balance of the assets of F&T Farms, according to each partner's pro rata share.

On or about January 18, 2012, pursuant to the terms of the Addendum, Plaintiffs Antonio Campos and Juliet Campos as Trustees of the Antonio and Juliet Campos Family Trust, paid all cash owed for the purchase of the goodwill of the Campos Brothers Farms handling enterprise, including the trade name and trademarks associated with, and owned and registered by Campos Brothers Farms. On or about that same date, the process for liquidation and distribution of Campos Brothers Farms partnership assets was also initiated.

On or about January 18, 2012, pursuant to the terms of the Addendum, Plaintiffs Antonio Campos and Juliet Campos as Trustees of the Antonio and Juliet Campos Family Trust, also paid cash and transferred equitable ownership to real property, owed for the enterprise and related processing and manufacturing

5

assets of F&T Farms.

Plaintiffs are informed and believe, and thereon allege, that following the August 26, 2011 agreement to sell Defendant Fermin M. Campos' entire interest in the Campos Brothers Farms handling enterprise to Plaintiffs Antonio and Juliet Campos (and/or their assigns), which included "Goodwill (and all other matters)" of Campos Brothers Farms, Defendants Veronica Campos, Fermin M. Campos, and Alfredo Martinez, on or about October 18, 2011, formed Defendant "Campos Family Farms, LLC," by filing documents for the same with the California Secretary of State.

Plaintiffs are informed and believe, and thereon allege, that like Campos Brothers Farms, Defendant Campos Family Farms, LLC is in the intended business of growing, marketing, and offering for sale natural California almonds and almond products domestically and internationally. Plaintiffs are informed and believe and thereon further allege that although the business address for Campos Family Farms, LLC on file with the California Secretary of State is 204 West Clarkson Avenue, Caruthers, California 93609, Defendant Campos Family Farms, LLC, intends to conduct its marketing and selling operations out of its business office located at 15630 S. Walnut, Caruthers, California 93609. [] Said business office is located approximately one-tenth of a mile down the street from the principal place of business of Campos Brothers Farms.

Plaintiffs are informed and believe and thereon further allege, that since at least October 18, 2011, Defendants, and each of them, have been growing, marketing, and preparing to sell their almonds and almond products to customers in and around this District, and throughout the State of California and the world, including several of Campos Brothers Farms' existing customers, using the name "Campos Family Farms, LLC" in conjunction with Campos Brothers Farms' trademarks, or deceptively similar reproductions of said trademarks. In addition, Plaintiffs are informed and believe and thereon allege that Defendants recently acquired approximately 1,000 acres of Marconas which, on information and belief, Defendants intend to market to Campos Brothers Farms' customers in Spain using the name "Campos Family Farms, LLC" in conjunction with Campos Brothers Farms' trademarks, or deceptively similar reproductions of said trademarks.

Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, have caused signs and labels to be made displaying the name "Campos Family Farms, LLC" in conjunction with Campos Brothers Farms' trademarks, or deceptively similar reproductions thereof, and have affixed said signs and labels to vehicles and other property owned by Defendants and used by them in the transaction of their business. []

In addition, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, have procured business cards and other promotional material bearing the name "Campos Family Farms, LLC" in conjunction with Campos Brothers Farms' trademarks, or deceptively similar reproductions thereof, and are using the same in the promotion and advertising of Defendants' almond and almond product business. [] Plaintiffs are further informed and believe that Defendants have procured stickers bearing Campos Brothers Farms' trade name and trademarks, or deceptively similar reproductions thereof, and have placed and are placing them on boxes and other shipping containers containing their products and are distributing them to vendors, customers, and the general public.

Plaintiffs are also informed and believe, and thereon allege, that Defendants, and each of them, as an initial step towards the development of a

6

1    website for the promotion, advertising, and sale of their products under the name
     "Campos Family Farms, LLC" and Campos Brothers Farms' trademarks, or
2    deceptively similar reproductions thereof, have registered domain names for
     "Campos Family Farms, LLC" which include, but are not necessarily limited to
3    www.camposfamilyfarms.com, www.camposfamilyfarm.com,
     www.camposfamilyfarms.net, and www.camposfamilyfarm.net. On information
4    and belief, said domain name(s) were registered by Defendant Martinez as early as
     May 4, 2010. Three of those domain names were updated on February 14, 2011.
5    The fourth domain name, www.camposfamilyfarms.com, was updated as recently
     as November 8, 2011. Defendant Martinez is listed as the administrative and
6    technical contact for said domain names.
             On or about March 7, 2012, counsel for Plaintiffs sent a cease and desist
7    letter to counsel for Defendants, directing that Defendants, and each of them,
     cease using the deceptively similar name "Campos Family Farms, LLC" and
8    infringing marks. No response was ever received and Defendants have continued
     to use the deceptively similar name "Campos Family Farms, LLC" and infringing
9    mark. []

10   (Doc. 1 at 3-11.)

11                                    **DISCUSSION**

12   ***The Parties' Positions***

13        Defendants contend that Plaintiffs' claims arise directly from and relate directly to a

14   settlement agreement dated August 26, 2011, an addendum to the settlement agreement dated

15   January 17, 2012, and a buy-out agreement dated January 17, 2012.  Those agreements include

16   arbitration clauses whereby any and all disputes over the terms or implementation of the

17   agreements are to be resolved by mediator Nickolas J. Dibiaso.  Hence, Defendants contend their

18   motion to compel arbitration of the claims contained in Plaintiffs' complaint should be granted,

19   and that this matter be stayed pending the outcome of the arbitration proceedings.  (Doc. 13.)

20        Plaintiffs assert that this Court should deny Defendants' motion because the arbitration

21   clauses within the agreements are "very narrow in scope and expressly limit arbitration to the

22   implementation of [the agreements'] terms."  Plaintiffs assert that because they have alleged tort

23   claims in their complaint that are independent of the settlement agreements themselves,

24   arbitration is improper.  (Doc. 17.)

25   //

26   //

27

28                                        7

***Applicable Legal Standards***

Title 9 of the United States Code section 4 provides as follows:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . .

For purposes of the Federal Arbitration Act ("FAA"), "arbitration" is an agreement to submit a dispute to decision by a third party.  9 U.S.C. § 1, *et seq*.

The FAA creates "a body of federal substantive law of arbitrability." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp*., 460 U.S. 1, 24 (1983).  It is applicable in both state and federal courts.  Thus, unless the agreement provides otherwise, all questions regarding interpretation of arbitration agreements are determined by federal standards.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006); *Moses H. Cone Mem. Hosp.*, 460 U.S. at 22-24.  Any question concerning arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.  *Simula, Inc. v. Autoliv, Inc*., 175 F.3d 716, 719 (9th Cir. 1999).  The FAA establishes that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem. Hosp.*, 460 U.S. at 24-25; *Simula, Inc.*, 175 F.3d at 719; *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1209 (9th Cir. 1998).

"Arbitration is a matter of contract and a party cannot be required to submit any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (citations omitted); *Three Valleys Mun. Water Dist. v. E.F.*

8

*Hutton & Co., Inc.*, 925 F.2d 1136, 1139 (9th Cir. 1991).   As with any contract, the parties'

intentions control. *Three Valleys Mun. Water Dist.*, 925 F.2d at 1139.  However, the parties'

intentions are generously construed to issues of arbitrability.  *Mitsubishi Motors Corp. v. Soler*

*Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

The FAA "leaves no place for the exercise of discretion by a district court, but instead

mandates that district courts shall direct the parties to proceed to arbitration on issues as to which

an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218

(1985).  The court's role is limited to determining: "(1) whether a valid agreement to arbitrate

exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*

*v. Ortho Diagnostic Systems, Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2001).  If both questions are

answered in the affirmative, the FAA requires the court to enforce arbitration.  *Id.*

When a party contends issues must be decided by arbitration, federal substantive law

governs the question of arbitrability.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d at 719.  However, the

federal policy favoring arbitration is inapplicable to the determination of whether a valid

agreement to arbitrate between the parties exists and ordinary contract principles determine who

is bound.  *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006).  In determining the

validity of an agreement to arbitrate, courts "should apply ordinary state-law principles that

govern the formation of contracts." *FirstOptions of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944

(1995).  "Thus, generally applicable contract defenses, such as fraud, duress, or

unconscionability, may be applied to invalidate arbitration agreements without contravening

[section] 2." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (2000).  "Courts may not,

however, invalidate arbitration agreements under state laws applicable only to arbitration

provisions." *Id.*; *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir. 2001).

1  ***Arbitration Clause Language at Issue***

2  　　　*August 26, 2011 - The Monterey Agreement*

3  　　　Paragraph eleven of the settlement agreement dated August 26, 2011, reads in pertinent

4  part:

5  　　　Any and all disputes over the terms or implementation of this agreement
   consisting of Paragraphs 1-12 herein shall be resolved by the Arbitrator, Nickolas
6  Dibiaso, but must first be submitted to mediation by James Simon and Mike
   Ueltzen.  If the mediation does not produce an agreement, the mediators will be
7  authorized to submit a report and recommendation to Justice Dibiaso in order for
   him to resolve the matter consistent with the general intent of the parties and
8  principles of fairness and equity.

9  (Doc. 13-2 at 1-2; Doc. 17 at 4.)

10  　　　*January 17, 2012 - The Addendum*

11  　　　In the addendum of January 17, 2012, the following language appears at paragraph

12  twelve:

13  　　　The parties agree that the Dispute Resolution Procedure set forth in ¶ 11 of
   the Monterey Agreement shall remain in control to enforce the parties' Settlement
14  until performance in full of the terms of the Settlement.

15  (Doc. 13-2 at 2.)

16  　　　*January 17, 2012 - The Buy Out Agreement*

17  　　　Paragraph two of the buy out agreement provides as follows:

18  　　　Any and all disputes over the terms and implementation of this Agreement
   shall be resolved by Justice Nickolas J. Dibiaso pursuant to his jurisdiction in the
19  *Campos v. Campos* Superior Court Action Case No. 10CECG01292 . . . but first
   must be submitted to mediation by James Simon and Mike Ueltzen.  If the
20  mediation does not produce an agreement, the mediators shall be authorized to
   submit a report and recommendation to Justice Dibiaso in order for him to resolve
21  the matter consistent with the general intent of the parties and principles of
   fairness and equity.

22

23  (Doc. 13-2 at 2; Doc. 17 at 5.)

24

25

26

27

28  　　　　　　　　　　　　　　　　10

1      ***Analysis***

2            *Whether a Valid Agreement to Arbitrate Exists*

3      Here, neither party challenges the validity of the arbitration agreements at issue. Rather,

4 the parties' dispute revolves around which claims are arbitrable, if at all, pursuant to those

5 agreements. Accordingly, the Court assumes the arbitration provisions are valid and enforceable

6 for purposes of resolving the pending motion.

7            *Whether the Agreement Encompasses the Dispute*

8      To determine whether the agreement to arbitrate encompasses the parties' dispute, the

9 Court must determine the scope of the arbitration clauses.

10      The Court looks to the plain language of the agreement. *United Steelworkers of Am. v.*

11 *Warrior & Gulf Navigation Co.,* 363 U.S. 574, 584-86 (1960). The arbitration agreements

12 between the parties provide that "any and all disputes" over "terms and implementation" are

13 subject to mediation. Plaintiffs contend their claims focus on trademark and trademark name

14 infringement, unfair competition and interference with economic advantage, fraud and breach of

15 fiduciary duty, and thus, their "claims are not based on enforcement" of the agreements. (Doc.

16 17 at 10, 12-14.) This Court is not persuaded by Plaintiffs' argument, nor the authorities relied

17 upon. Rather, the Court agrees with Defendants that an interpretation of term "goodwill" as used

18 in these agreements is necessary and relates directly to Plaintiffs' claims. Plaintiffs cannot

19 separate their purported "core" allegations from the overall issue of interpretation of the term

20 "goodwill" as used in the agreements. Perhaps their emphasis on the purported "core"

21 allegations is because Plaintiffs have already acknowledged to Defendants that a "trademark is a

22 symbol of, and is inseparable from, the goodwill of a business." (*See* Doc. 1-7, Ex. G.)

23      With regard to Plaintiffs' assertions that the language in the agreements is narrow and

24 thus does not require arbitration (Doc. 17 at 5-12), again the Court is not persuaded by Plaintiffs'

25 argument nor the legal authorities upon which their arguments rest. More specifically, the

26 language at issue in *Mediterranean Enterprises, Inc. v. Ssangyong Corporation,* 708 F.2d 1458

27

28                 11

(9th Cir. 1983) and *Tracer Research Corp. v. National Environmental Services Co.*, 42 F.3d
1292 (9th Cir. 1994) is very different than that employed in the agreements at issue here.  In
*Mediterranean Enterprises*, the Ninth Circuit considered a clause that required arbitration of
"[a]ny disputes arising hereunder," which the court considered synonymous with "arising under
the Agreement."  *Id.*, at 1464.  Relying on case law from the Second Circuit, the Ninth Circuit
found that the phrase "arising under" is "relatively narrow as arbitration clauses go."  *Id.* at 1464
(quoting *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 364
(S.D.N.Y. 1966)).  The court found the omission of broader language, such as "relating to," to be
significant and agreed with the Second Circuit that the language "arising under" restricts
arbitration to disputes related to the interpretation and performance of the contract.
*Mediterranean Enterprises*, 708 F.2d at 1464 (citing *In re Kinoshita & Co.*, 287 F.2d 951, 953
(2d Cir. 1961)).  Based on this analysis, the Ninth Circuit found that the district court had
properly referred the plaintiff's breach of contract and breach of fiduciary duty claims to
arbitration, and properly refused to compel arbitration of the plaintiff's claims for quantum
meruit, conversion, and conspiracy to induce breach of an entirely separate contract.  *Id.*  The
Ninth Circuit reaffirmed this analysis in *Tracer*, where it considered a clause that covered
disputes "arising out of" an agreement, but omitted reference to claims "relating to" an
agreement.  *Tracer*, 42 F.3d at 1295.  After determining that such language "is of the same
limited scope as the 'arising under' language in *Mediterranean Enterprises*," the court held that
the plaintiff's claim for misappropriation of trade secrets was not arbitrable.  *Id.*

The "any and all disputes" language here is readily distinguishable from the "arising
under" language in *Mediterranean* and *Tracer*.

In *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, the two parties entered into a contractual
relationship in which Simula was to provide Autoliv with certain car parts that Autoliv would
then deliver to BMW.  *Id.* at 718.  The contract included an arbitration clause that stated that it
would apply to "[a]ll disputes arising in connection with this Agreement."  *Id.* at 720.  Autoliv

12

then began producing similar car parts that it marketed in direct competition with Simula's

products. *Id*. at 718.  Simula brought suit, alleging violations of antitrust, trade secret, trademark,

and defamation laws. *Id*. at 719.  Autoliv moved to compel arbitration under the parties' contract,

and Simula objected, arguing that its claims were outside the scope of the agreement. *Id*. at 719.

The Ninth Circuit determined that the language "'arising in connection with' reaches every

dispute between the parties having a significant relationship to the contract and all disputes

having their origin or genesis in the contract. [¶]  To require arbitration, [a party's] factual

allegations need only 'touch matters' covered by the contract containing the arbitration clause

and all doubts are to be resolved in favor of arbitrability." *Id*. at 721.  The Ninth Circuit

therefore ordered the parties to arbitration. *Id*. at 726; *see also Chiron Corp. v. Ortho Diagnostic*

*Sys., Inc.*, 207 F.3d at 1131 ("The record here leaves little doubt that the dispute is subject to

arbitration . . .  The parties' arbitration clause is broad and far reaching: 'Any dispute, controversy

or claim arising out of or relating to the validity, construction, enforceability or performance of

this Agreement . . .'").

        Like Simula, the Plaintiffs' claims here fall within the broad scope of the arbitration

clauses involved.  They reach every dispute between the parties and all disputes have their origin

or genesis in the agreements executed on August 26, 2011, and January 17, 2012.  More

particularly, whether or not trade name and trademark were infringed, whether unfair

competition, false designation of origin and dilution of mark occurred, whether business

reputation was damaged, whether a counterfeit mark was employed or cyberpiracy or false

advertising occurred, whether negligent or intentional interference with prospective business

advantage occurred, whether fraud and unjust enrichment occurred, and whether or not a breach

of fiduciary duty occurred, all relate to the Monterey Agreement, the Addendum and the Buy Out

Agreement.

//

//

13

1       *Campos Family Farms, LLC*

2              Plaintiffs assert that Defendant Campos Family Farms, LLC, cannot compel arbitration

3       because it is a nonsignatory and thus Plaintiffs claims against it should be litigated. (Doc. 17 at

4       14-15.) Defendants agree that Defendant Campos Family Farms, LLC, is not a signatory to

5       agreements including the arbitration clauses. However, because Plaintiffs allege in their

6       complaint that the entity was created to enable Defendants to violate the rights afforded to

7       Plaintiffs, they should be required to arbitrate their claims against this Defendant rather than

8       isolate those claims, particularly where those claims are clearly related to and intertwined with

9       Plaintiffs other claims against Defendants Veronica Campos, Fermin M. Campos, and Alfredo

10      Martinez. (Doc. 13-2 at 7-8; *see* Doc. 29 at 6-8.)

11             Signatories have been required to arbitrate claims brought by nonsignatories "'at the

12      nonsignatory's insistence because of the close relationship between the entities involved.'"

13      *Comer v. Micor, Inc*., 436 F.3d at 1101 (internal citation omitted). As stated by the Ninth Circuit

14      in *Mundi v Union Sec. Life Ins. Co.*, 555 F.3d 1042 (9th Cir. 2009):

15                          General contract and agency principles apply in determining the
                     enforcement of an arbitration agreement by or against non-signatories. Among
16                   these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4)
                     veil-piercing/alter ego; and 5) estoppel. [¶] Equitable estoppel precludes a party
17                   from claiming the benefits of a contract while simultaneously attempting to avoid
                     the burdens that contract imposes. We have examined two types of equitable
18                   estoppel in the arbitration context. . . . [¶] Neither line of cases addresses the
                     precise situation we face.
19

20      *Id*., at 1045-46. The Ninth Circuit thereafter considered opinions of the Fourth Circuit wherein

21      the latter court considered the situation of a nonsignatory seeking to compel a signatory to

22      arbitrate its claims against the nonsignatory. Those cases considered whether the subject claims

23      were intertwined with the contract providing for arbitration, or whether they arose out of or

24      related to the contract containing the arbitration agreement. *Id.*, at 1046-47.

25             Here, Plaintiffs' claims against Defendant Campos Family Farms, LLC, are both

26      intertwined with the contracts providing for arbitration, and arise out of or relate to those

27

28                                                         14

contracts.  The resolution of Plaintiffs claims requires an examination of the contracts

themselves, as previously explained, despite Plaintiffs' assertions to the contrary.

### *Conclusion*

As the United States Supreme Court has determined, the FAA "leaves no place for the

exercise of discretion by a district court . . .." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. at

218.  This Court has determined that there exist valid agreements to arbitrate between the parties,

and that those agreements encompass the disputes at issue here.  *Chiron Corp. v. Ortho*

*Diagnostic Systems, Inc.*, 207 F.3d at 1130.  Thus, the Court finds the circumstances in this case

call for a resolution in favor of arbitration.

## RECOMMENDATIONS

For the reasons stated above, this Court recommends as follows:

1.     That Defendants' motion to compel arbitration be GRANTED;

2.     That the matter be STAYED pending the outcome of arbitration proceedings; and

3.     That the parties jointly provide this Court with a written status report within five
       days of the completion of the arbitration proceedings.

These findings and recommendations are submitted to the district judge assigned to this

action, pursuant to Title 28 of the United States Code section 636(b)(1)(B) and this Court's Local

Rule 304.  Within fifteen (15) days of service of this recommendation, any party may file written

objections to these findings and recommendations with the Court and serve a copy on all parties.

Such a document should be captioned "Objections to Magistrate Judge's Findings and

Recommendations."  The district judge will review the magistrate judge's findings and

recommendations pursuant to Title 28 of the United States Code section 636(b)(1)(C).  The

parties are advised that failure to file objections within the specified time may waive the right to

appeal the district judge's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

15

Dated:   **June 8, 2012**                  **/s/ Gary S. Austin**
                                    UNITED STATES MAGISTRATE JUDGE